Denio, Ch. J.
Two generakquestions were litigated in this case—whether the defendants were shown to have been ■ guilty of negligence, and if they were, whether the conduct of the plaintiff’s intestate, on the occasion of the injury, was also negligent in a degree which contributed to produce the fatal result. If the second position is established, it is too well settled to need a reference to authority that the plaintiff cannot recover. The collision occurred in the city of Troy, where the defendant’s railroad crosses -Fourth street upon the same grade with the street. Such arrrange ment of thoroughfares renders the travel, at the point where the railroad and the street coincide, especially in a large town, unusually hazardous, and they call for a high degree 5f caution both on the part of the managers of the railroad and of individuals, who, in using the street, have occasion to cross its track; and it may well be doubted whether, as a question of policy, they ought to be permitted by public authority. ■ They are, however, tolerated by law, and our duty, in the cases which are brought before us, is to determine, in view of the nature -of the. subject, and of the special' facts presented, upon whom the culpa *325 bility in the particular instance rests.. The defendants having the general right in this case to run their engines and car» across the street, they must be shown to have commit ted some fault in the manner of doing it. It is not enough to point to the deplorable result which ensued, and show that it was attributable to the running of the train across the street, but it must be shown that there was something improper in the manner of running the train, before the defendants can be made responsible for the consequences. It is suggested that the train was out of time, and the proof certainly is that the regular time for starting was about eleven o’clock in the forenoon, and the collision'is admitted to have occurred about noon, and the distance that had been ran would have required but a few minutes. But it is in proof that between thirty and forty trains pass over the road each day. However perfect the arrangements of a railroad management maybe, they cannot, of course, be entirely independent of accidental circumstances, which may prescribe the period of setting out and arriving. Ho person can reckon with any sort of safety upon the point of time when a train will pass over a particular place; and where the trains are so numerous as on this • road, it would be impracticable for a traveler on an intersecting street to protect himself by learning the times of arrival and departure of the several trains, and there is no pretence that anything of the kind was attempted by the deceased in the present instance. Ho one can be secure against being met by an engine except by ascertaining by his own senses that no train is approaching in either direction within a-distance which will endanger his safety. There is no ground for attributing any negligence to the defendants in respect to the flagman. I will assume that it was their duty to place a person at the point of intersection to warn persons against crossing when trains were approaching; and this was done in the present instance. The evidence is clear beyond contradiction, that such a person was stationed between the *326 two tracks with a flag, when the train and the deceased were approaching the spot where the collision happened. That he did his whole duty by displaying his flag and warning passengers off by remaining as long as he possibly could, consistently with his own safety, is sufficiently apparent from the evidence, and from the fact of .his being knoóked down by the horse of the deceased and his barely escaping being run over by the engine, But the allegation of negligence principally relied , on is that the train was being ran at an unusual and dangerous rate of speed, This involves the question, in the first place, as to the rapidity at which the train may be run in a city where the intersecting streets are upon the same level. As the law has not fixed the speed at which they may be run, it is generally a question of fact in each case whether the actual rate was excessive or dangerous. Whether it is so or not, will depend, to some extent, upon the safeguards which are adopted to prevent accidents, It is not .correct to say that in every case where a fault in this respect is alleged, the question must be submitted to the, jury. If it be clearly shown, that on the occasion in question the velocity was not greater than that which had been usually practiced for a considerable period, with the tacit consent of the community and without accident, it should not be considered an open question whether running at that rate was negligent and unlawful.
The other question, as to the actual speed at which the train was run, is yet more difficult. The persons concerned in the management^ of the train, as engineers, conductor, firemen, and the like, have the best opportunity of judging, on account of their situation, the nature of their duties, and the experience which their employment must give them. But they are subject to a natural bias in favor of a determination which shall- exempt them from censure. A passenger, if his attention is attracted to the subject at the proper time, has some advantages over a bystander, and the latter is legally competent to speak upon the question, but *327 his evidence is entitled to but little weight, unless some special circumstance led him to think of the question at the time the transit was taking place; nor then, unless he had been in the habit of observing the passing of trains and estimating "their speed. In- this case the servants of the defendant,, five in number, unite substantially in declaring that the speed did not exceed that which was usual, namely, about five or six miles per hour. On the other hand, a passenger, who thinks his attention was at the time directed to the subject, and three other of the plaintiff’s witnesses who were standing in the street, testify more or less strongly that the running was unreasonably and unnecessarily rapid, and reaching, according to some of them, to twenty miles an hour. Some criticisms may ‘be justly applicable to one or more of these witnesses, but I think there was a sufficient conflict of evidence to render it improper to take the question from the jury, if the determination of the case depended upon it- I am far,- however, from 'saying that, as a juryman, I should have found, as the just result of the whole evidence, that the allegation of negligence in this respect was established. The great danger of immoderate running in such a locality, whatever collateral safeguards may be provided, should admonish the governing authority of these companies to take extraordinary care—not only that it should not be indulged in, but that unimpeachable evidence .should be at hand to demonstrate—that excess in this respect had never occurred.
Upon the other general question, I am of opinion that the uncontradicted evidence was such as not-to present anything for the jury to deliberate upon. If one will heedlessly or rashly drive upon the track of a railroad where trains are constantly or frequently passing, without taking pains to ascertain whether one is actually approaching or not, it will strike every one intuitively that he is running a great and unnecessary risk. A crossing can rarely, if ever, be so situated as to render it impossible or difficult *328 for a traveler to observe the track on each side for a sufficient distance to determine whether it is safe to proceed. If such localities exist, they should not be crossed at all; and it would be equally imprudent in the company to tolerate them, and in the passenger to use the crossing. If the case is such as to require the person wishing to cross to come near the track to make his observation, that cir cumstance, so far from excusing him from the duty of looking at all, would only render that duty more imperative, if he would avoid the imputation of negligence. Tho evidence in this case shows that the track, of the railroad, east of the Fourth street crossing, was upon a straight course for the'' distance of at least six hundred and fifty feet from that crossing. Although there were buildings on the east side of Fourth street, yet the whole distance I have mentioned could be seen by a person approaching, as the deceased did, on Fourth street, from the south, before entering upon' the track. If the train had been beyond the range of his vision, when he came near the crossing, there would have been ample time for him to drive leisurely across both tracks, which were, together, including the space between them, only seventeen feet wide. But if he saw the train coming towards the crossing, and determined to try the speed of his horses against that of the approaching engine, he did it, I think, at his peril. And the case would be the same if he heedlessly drove upon it without concerning himself to ascertain that it could be safely done. That he had an opportunity to see the train, if he had looked, in -time quite sufficient to avoid all danger, either by stopping or by turning to the sidewalk, is certain, upon the testimony of every witness who has spoken on the subject. That he did in fact see it at some time before the collision is evident from the testimony of all the wit-, nesses to the principal fact; for they swear that he whipped his horses in order to get across before the engine should reach him. It may be, as one of the plaintiff's witnesses *329 testified, that when this took place he had advanced too far to stop or turn. But I can perceive no possible reason why he did not, when sufficiently near to observe the track in the direction from which the train was approaching, use that natural and indispensable precaution. I have thus far omitted any mention of the other warnings that were shown to have been given. There was no material contradiction of the evidence showing that the whistle was sounded and the bell rung in sufficient season to warn any person who was at or near the Fourth street crossing. It was sworn to by seven witnesses, embracing the defendants’ servants on • the cars, and other persons who were at Fourth street. It did not raise any question for the jury for two or three other persons to swear that they did not hear, or did not remember to have heard these signals until immediately after the collision. It is matter of common observation that persons who are habitually in a situation to hear the passing of railroad trains fail to notice the noises which accompany them. If a jury could be permitted to find, against the 'evidence which was given in this case, that these warnings were not given until it was too late for them to be useful, there could be no longer any truth in human testimony. The evidence of personal warning to the deceased was very strong, and was substantially uncontradicted. The flagman heard the whistle and bell, and after so hearing them he went from his flag-house, got his flag and stationed himself on the track at the crossing and waved the flag. At that time there was no person crossing the track, though there were teams on the south side of the railroad which were stopped. A woman with a child attempted to cross from the other side, and while he was engaged in keeping her off he was struck by the team and knocked down and barely escaped from being run over by the engine. A Mrs. Banker lived in a house at the northeast corner formed by the intersection of the railroad with Fourth street, and was at the time sitting at a window *330 in the second story fronting the track. According to her testimony she heard the whistle and bell and looked out before the cars came, and then saw the deceased approaching on a fast trot, and hallooed to him twice to stop. He looked around, raised his whip and struck his horses. She saw the flagman hold his flag and saw, him knocked down, and his flag fall. She is supposed to be contradicted by Martin O’Laughlin, one of the plaintiff’s witnesses who swore he was standing on the threshold of the front door of the same house. This would be some evidence that her exclamation was not sufficiently loud to be heard in the street, but it does not1 draw in question the fact that she saw the deceased approaching towards apparent danger before the cars were in sight, and when it was in time for him to have stopped his horses. Two other witnesses for the defendants, Orr and O’Brien, testified that they were standing in Fourth street, on the south side of the railroad, and about three feet from the track. Orr said O’Brien shouted to the deceased three times, and they united in saying that O’Brien stepped forward to grasp the horses. Witnesses were examined as to the character of both these persons, and their testimony was unfavorable to their character. In examining a judgment of non-suit we can only, rely upon evidence which is substantially uncontradicted and unimpeached, and I have therefore formed my conclusion in' this case from the evidence other than that given by Orr and O’Brien. Laying aside their testimony, I find it established beyond contradiction that the deceased drove, his horses on to the defendant’s road, without giving any attention to the track, with a view to see whether a train was approaching, when such attention as a man having ordinary discretion and prudence would have bestowed, would have disclosed the advance of the train and would have effectually preserved, him from danger. The truth plainly was that he gave no heed to the railroad before him until he came very near it, and then chose to try the *331 experiment of endeavoring to cross it in front of the engine, for that purpose applying the whip to. his horses. But they became restive and uucontrollable, partially stopped upon the track, and the wagon was hit, and the deceased was fatally injured. Several such cases have come into the courts. In Spencer v. The Utica & Schenectady Railroad Co. (5 Barb. 337), the person injured, who was the driver of the wagon, was in a condition to see the train, and either suffered his attention to be directed'to another object, so as not to observe it, oi* seeing it, thought he could drive across the track before it would strike him, and erred in his reckoning. He miscalculated and was struck. The court set aside the report of referees in his favor, though the judges admitted that negligence on the part of the defendant was established. In Steves v. The Oswego and Syracuse Railroad Co., in this court (18 N. Y. R. 422), there was sufficient evidence in the view of a majority of the judges to submit the question of the negligence of the defendants to the jury, and yet a non-suit was sustained on the ground that the plaintiff drove on to the track without looking up and down to see if a train was approaching, it being evident that such observation would have disclosed the advance of the train. The same principle was affirmed when the present case was before this court on a former occasion. The plaintiff gave some additional evidence on the second trial, but it was not of a character to change the opinion which I then formed upon this point of the case.
I am in favor of affirming the judgment of the supreme court.
All the judges concurred excent Hogeboom, J.
Hogeboom, J.
I do not see that the reversal by this court of the former judgment in this case settled any prin ciples cf law, which are in any way decisive of the present appeal Five judges concurred in the judgment of rever *332 sal. Judge Gould wrote an opinion for reversal, from which it would appear that the trial (not the transaction), was a tragedy of errors. Judges Davies and Smith are stated to have concurred—perhaps in the opinion, perhaps in the result. Judges Dentó and Allen were also for reversal—the latter on the ground of the plaintiff’s negligence. Judge Sutherland wrote a dissenting opinion. Judges Selden and Wright were absent. I conclude that a majority of the judges did not express their concurrence in the views — certainly not in all of them — advanced by the learned judge who penned the leading opinion. I regard the case as open to the application of the principles which have been heretofore supposed pertinent to cases of this description; at all events as open to the consideration of the question, whether the facts, or the evidence of the facts, was so far varied on the trial now under review as to require the submission of those facts or that evidence to the jury.
There being no doubt that Wilds’ death was occasioned by the defendants’ locomotive engine, the two leading questions arose, as in nearly all eases of similar casualties. 1. Was such death occasioned by the defendant’s negligence; and if so, 2. Did Wilds’ own negligence, in part, contribute to the fatal result?
The particular aspect in which those questions were presented tin this trial was: Was there sufficient evidence to go to the jury on these questions? If so, as the judge refused to submit the same to the jury, notwithstanding a request to that effect, there should be a new trial granted.
1. Was there evidence sufficient to go to the jury on the question of the negligence of the defendant’s agents and servants? The principal facts relied upon for this purpose, in the present case, I understand to be four. 1st. The excessive speed of the-train. 2d. The failure to wave a flag at the crossing. 3d. The want of a.sufficient number of brakemen on the train. 4th. The failure on the *333 part of the officers and men managing the train to discover the danger in season to have prevented the accident.
Without reciting the evidence in detail, on all these points, I am of opinion, as I was on both of these trials at which 1 presided, that there was sufficient evidence to submit to the jury on the two leading points, to wit: Whether the defendants kept up a proper look out, and whether the rate of speed was not excessive and dangerous. On the first of these propositions there was much and I think preponderating evidence that the defendant’s agents might, with proper watchfulness, have observed the danger at a much farther point from the point of collision than they did; and if so, the casualty would not probably have occurred. The crossing was in view for a considerable distance, and yet both the engineer and the fireman swear that they did not observe the deceased or his team until they were nearly upon them.
Upon the other point—the speed of the train—the evidence was conflicting, and such as, I think, would have required its submission to the jury, if that were the controlling point in the case. Two witnesses sworn on both trials for the plaintiff, Carroll and Gillespie, say, the one that the train was coming fast, which was not usual there, and the other that they were running very rapidly. Two other witnesses, O’Laughlin and Williams, not sworn on the first trial, testified on the second, the one that the train was running as fast as twenty miles an hour, the other between twenty and twenty-five miles an hour. There were other witnesses whose testimony tended to show a rapid rate of speed.. Some five witnesses for the defendant testified in substance to their opinion that the train was running the usual speed—some five or six miles an hour. I do not think a verdict would have been set aside finding the higher rate of speed; and I do not hesitate to say that such a rate of speed across the crowded thoroughfares of so large a city is, in my opinion, indefensible. It is quite *334 clear that such a rate of speed, if it was maintained in the present case, caused the collision, and that the usual rate of speed would have prevented it.
The more important and difficult question is whether Wilds was guilty of negligence contributory to the accident. He is charged to have been guilty of negligence in . several particulars: 1st. In want of attention to the usual signals—the bell, the whistle and the flag. 2d. In not observing, or wilfully disregarding, shouts and warnings of danger. 3d. In driving at an improper rate of speed, and manifesting a reckless determination to cross the track in the face of known and impending danger.
In reference to the signals of danger proper to be given by the defendants, it would appear that the bell was seasonably rung. Wilds may or may not have heard it. We cannot say that he did; others near him did not. We can scarcely say that it was negligence not to have done so. The whistle was sounded only just before the collision, and probably not in season to have given any useful warning to him. The flagman was at his post, and had been waving his flag, but was not in the1 act of doing so when Wilds approached the crossing. He appears to have been momentarily engaged in the praiseworthy act of warning away a woman who was approaching the crossing, and yet it may be that' the absence of the usual flag signal may have induced Wilds to approach the crossing with less hesitation and care than he would otherwise have done. In none of these things does it appear to me was there such marked carelessness on his part as to have justified a refusal to submit the question to the jury.
He does not appear to have approached the crossing at an improper rate of speed, though there is some conflict of evidence on that point; but he is supposed to have been inattentive or recklessly indifferent to shouts of warning and danger. The question is, on the evidence given on the second trial, whether these warnings were in fact given. *335 Mrs. Banker swears that she gave them, but some doubt is thrown .on her testimony by that of McLaughlin, a witness not sworn on the first trial, who was in a situation to hear, and did not hear the warning professed to have been given by Mrs. Banker. She is also contradicted or differed from by other witnesses. Orr swears that O’Brien gave the warning, but O’Brien does not say so himself, and both O’Brien and Orr are to some extent impeached by general evidence attacking their credibility as witnesses. And they are not supported by counter evidence. The question is whether, on this material part of the case, there was not sufficient doubt thrown upon the testimony of Banker, O’Brien and Orr, or contradiction given to it, to raise a question of credibility for the jury and not for the ■ court. I incline to think, on the whole, that there was.
The remaining question is whether Wilds’ approach to the place of collision, and attempt to cross the track, were marked by such evidences of carelessness or recklessness as should defeat the recovery. It is upon this part of the case that I have felt the greatest doubt. I should certainly have supposed it a more prudent act not to have attempted to cross the track, but that is not quite the question to be determined. It is whether, on the whole, it was a question for the jury—whether mis-judgment was such carelessness as should defeat the action—whether a man of ordinary prudence might not have doubted whether it were not probable the crossing could be safely effected and safer to attempt it than to run the hazard of the engine and train coming up directly in the face of the horses in close proximity to the track—whether the sudden and impending-danger would not excuse an error of judgment or the fail'ure to manifest that coolness and self-possession which, under ordinary circumstances, might be expected or demanded; and whether, on the whole, these were not more properly considerations to be addressed to the sound sense and temperate discretion of .a jury, under cautious instruc *336 tians from the court, than such as should influence the court to take the matter into its own keeping and dispose of it upon its own responsibility, without the intervention of a jury. It is a case for doubt and hesitation, I think, as to which was the more proper course. And yet I am inclined to think it more consistent with the theory on which the -right of trial' by jury rests, and safer for the general interests of parties, to resolve such doubts in favor of the submission of such questions to the jury than the withdrawal of them from their consideration.
In arriving at this conclusion, I have done so upon the idea that it is ordinary care and prudence and not the highest and most extraordinary manifestations of those qualities which are exacted of persons circumstanced as Wilds was upon that occasion. The learned justice who pronounced the prevailing opinion in this court when- the case was here formerly for review, supposes that all distinctions as to the different degrees of care requisite under such circumstances were intended to be obliterated by the judgment of this court; but I do not so regard it, and shall not come to such a conclusion until I see more conclusive evidence of such a determination than a careful review of the results arrived at in that case has led me to make.
In granting the non-suit at the circuit, I was governed by a wish to conform to what, on a hasty examination, I. ■supposed to be the authoritative judgment of this court as declared in the opinion referred to; but a more careful revision of it, in the light of the facts of this case as compared with those then presented, has satisfied me that in arriving at the conclusion just expressed on this appeal, I am in no degree departing from the principles of the judgment then pronounced.
I am in favor of reversing the judgment of the supreme court, and ordering a new trial, with costs to' abide the event. Judgment affirmed.